made, although she had at that time kept house for her brothers for about 14 years. This follows from the fact that, by her own statement, she had never asked for pay, and the mere fact of doing the work raised no presumption of a promise to pay for it. The question comes to this: Defendant says Vincenzo made a promise, after which defendant worked 5 years in reliance on that promise. Does this amount to a consideration sufficient to support the transfer?

Putting the matter in another way, it is urged that the consideration for this conveyance was 5 years' housekeeping in reliance upon a promise to "give" defendant some mortgages when her brother sold a certain house. We shall assume, but not decide, that if the promise was made; and the mortgages given constituted a reasonable fulfillment of promise, a consideration would exist for the conveyance when made.

The lower court has not by opinion informed us of the exact ground on which defendant's ownership of this mortgage was upheld. We therefore feel compelled to examine and appraise the evidence by which decision must be made. It is found that as a payment, reward, or "gift" for 5 years' housekeeping the defendant, without ever asking for any specific sum, and without any agreement upon any specific sum, was made the record owner of mortgages aggregating about $24,000, and, so far as shown, worth that sum, and that these transfers were completed at a time when the business affairs of Vincenzo Bajardi were desperate; his firm being grossly insolvent.

We note, also, that when plaintiffs attacked the transaction, it was supported by nothing but the unsupported recollection and assertion of the most interested person, whose intelligence and education may be appraised by reading the foregoing quotations from her evidence. Further, her story received no support from the man said to have made the promise. The circumstances fit all too closely a typical effort to save for the family something from the family shipwreck.

We are forced to hold that the story of a promise cannot be believed. Doubtless defendant did the work as related; doubtless, also, she received support according to her habit of life; but the alleged promise to give her an uncertain sum at an indefinite time cannot in our judgment be accorded credence, and for this reason the decree below is reversed, and the cause remanded, with directions to grant the relief prayed for in the bill.

## THE ST. CHARLES. THE R. J. BARRETT. THE EXCELSIOR.

(Circuit Court of Appeals, Second Circuit. March 1, 1926.)

No. 213.

**1. Collision ⬬95(3).**

Steamer in tow, with steam up, and tug, held jointly responsible for collision of steamer with ferryboat, when hawser parted.

**2. Collision ⬬95(1)—Master of vessel in tow, whether or not in control, held to have right and duty of co-operating with tug, and using engines, if necessary.**

Master of vessel in tow, with steam up, whether or not in full control, *held* to have right and duty of co-operating with tugs, and especially of using engines, if circumstances required it.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Riverside & Ft. Lee Ferry Company, owner of the ferryboat Ft. Lee, against the steamship St. Charles, the Maru Navigation Company, claimant, which impleaded the Mutual Towing Company, Inc., and steam tugs R. J. Barrett and Excelsior. From a decree for libelant against the steamship St. Charles and the tug Barrett primarily, and for any deficiency against the Mutual Towing Company secondarily, dismissing the libel as to the tug Excelsior, the Towing Company and claimant of the R. J. Barrett appeal. Affirmed.

The opinion of Ward, Circuit Judge, in the court below, is as follows:

[1] "February 10, 1920, the steamer St. Charles, about 281 feet long, was lying light, stern out, on the south side of the southernmost pier of Tietjen & Lang's dry dock at Weehawken, N. J., even with the end of the pier. About 4:20 p. m. her agents telephoned to the Mutual Towing Company to send one tug to assist the steamer, which was intending to go to sea that night, from the dock into the stream. The Mutual Company engaged the tug R. J. Barrett from the Barrett Company, and a little later, at the suggestion of the master of the Barrett, the Barrett Company advised the Mutual Company that a second tug would be wanted, and the Mutual Company thereupon asked the Barrett Company to send the Excelsior in addition, which was done at about 5 p. m. But the steamer was not ready to go to sea that night, because some of her crew were ashore, so the

tugs were told to come back the next morning. The chief engineer of the steamer warmed the engines and made a dock trial for over an hour between 4 and 6 a. m. of the 11th, and found them working all right.

"February 11, at 7 a. m., the tugs returned, but the steamer was still waiting for one of the engineers. When he came, the steamer's officers told the captain of the tug Barrett that she was ready to go, and, as the custom is, passed a towing hawser from her port quarter bitts to the Barrett's stern, while the Excelsior took a head line from the port bow to her own bow. It was the duty of the Barrett to tow and of the Excelsior to be towed, except when necessary to use her own power to clear the steamer's bow from any obstruction. The master of the steamer rang to the engine room to stand by; the chief engineer took his place at the throttle, and the other engineers their places in the engine room; the master and a Sandy Hook pilot were on the bridge.

"The United States chart shows that the Basin is very narrow, and requires a broad change of course from the northward to eastward to get out into the stream. The rough diagram made by the master of the steamer, several months after the occurrence, from memory and not to scale, does not show adequately this difficulty of the situation.

"The Barrett towed the steamer two-thirds of her length beyond the pier, then broke her around the corner and began to tow northward to pass between the stern of the steamer Madison, projecting eastward some 25 feet beyond a pier higher up, about even with the north and west corner of the Scandinavian pier, leaving an open space of some 250 feet. The Barrett stopped her engines, blew a signal to the Excelsior to go astern, so that the steamer's bow might clear the Madison's stern, and the Excelsior blew a signal when the bow was clear. The steamer's engines were not used in this maneuver. She was then slowly approaching, at an angle of about 45 degrees, the side of the ferryboat Ft. Lee, lying outside of another ferryboat on the south side of the Erie Railroad pier which runs east and west. The steamer's stern being then about 150 feet from the side of the ferryboat, the Barrett hooked up and ported to almost a right angle, to swing her more or less broadside to the eastward and go out of the entrance of the Basin. When the stern of the steamer was about 50 feet from the ferryboat, the towing hawser parted. The master of the steamer at once ordered her engines full speed ahead, but not soon enough to stop her sternway before striking the side of the ferryboat. After the collision the same hawser was used to tow the steamer into the stream.

"The owners of the ferryboat filed this libel against the steamer, and her claimant brought in the Mutual Towing Company and the tugs under the fifty-sixth rule in admiralty.

"The master of the steamer had told the Sandy Hook pilot that he was to take charge when the steamer was in the stream, and also that the engines of the steamer would not be used; but I am quite clear that neither the Mutual Company nor the tugs were told that they were to be in control, nor that the steamer would not use her engines. They were informed that the steamer had steam up, and naturally understood that it would be used when necessary, and that the master and Sandy Hook pilot on the bridge were in control. No one would try to move a dead steamer, especially from a congested basin like this, with one tug. At least two more would have been required, one of them alongside, as a substitute for the steamer's engines, to check her movements, when necessary, by going ahead or astern.

[2] "No doubt the Barrett was expected to conduct the movement so far as the tugs were concerned generally, but the master's authority remained paramount. He must have understood this, because he says that, before clearing the stern of the Madison, he did check the Barrett's speed, and once ordered the Excelsior to go astern for that purpose, and he went full speed ahead, as we have seen, when the towing hawser parted. Whether he regarded the Barrett as in full control or not, he had the right and was under the duty of co-operating, and especially of using his engines, if circumstances required it.

"The claimant of the steamer contends that, if the Barrett had towed her nearer to the north and west corner of the Scandinavian pier, that is, a little more to the eastward, she would not have had to put such a strain on the towing hawser, and, indeed, would not have struck the ferryboat even if it parted. Beebe, the Sandy Hook pilot, a disinterested and I think a very competent and honest witness, says that the Barrett's navigation in this respect was unskillful, and I so find.

"The proximate cause of the accident was the parting of the hawser, a 7 to 8 inch manila line, apparently in good condition, and

proved to be sufficient for the towing of this light steamer both before and after the accident. I find that it parted because of the strain when the Barrett hooked up to pull the steamer around and clear of the ferryboat. It should have been plain to the master of the steamer that there would be a strain on the hawser when this was done, and I think he should have used his engines in assisting the Barrett to swing her clear before the hawser parted, and is at fault in this respect.

"There were two statements about which there has been much dispute, and I will dispose of them without more particularity than to say that I do not believe that the steamer started her engines astern, as the witnesses from the tug say, or that the Barrett cut the towing hawser, as witnesses from the steamer say.

"A great many cases have been cited by counsel, and without discussing them particularly it may be said of all of them that they must be read with reference to their particular facts. Generally speaking, the handling by tugs of canal boats and sailing vessels and steam vessels without steam is very different from tugs handling steamers with steam; so there is a difference between cases turning upon the knowledge by tug masters of local channels, obstructions, currents, etc., not known to navigators generally, and situations like this, where the difficulties that existed would be apparent to any experienced navigator.

"On the whole case I find the libelant is entitled to a decree against the claimants of the steamer and the tug Barrett and their stipulators primarily, and for any deficiency against the Mutual Towing Company secondarily; the libel against the tug Excelsior is dismissed, with costs against the claimant of the steamer."

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for appellants Mutual Towing Co., the R. J. Barrett, and the Excelsior.

Loomis & Ruebush, of New York City, (Homer L. Loomis, of New York City, of counsel), for appellees the St. Charles and her owner.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

PER CURIAM. Affirmed, on Judge Ward's opinion in the court below.

---

**In re GUBELMAN et al.**

(Circuit Court of Appeals, Second Circuit. Dec. 7, 1925.)

No. 52.

1. **Bankruptcy ⬅467—On appeal from order dismissing reclamation claim in bankruptcy, court reviews both findings of fact and conclusions of law.**

On appeal from order dismissing reclamation claim in bankruptcy, court reviews both findings of fact and conclusions of law.

2. **Stipulations ⬅3—Stipulation as to meaning of language in reclamation petition not binding on court.**

Stipulation as to meaning of "the day said petition in bankruptcy was filed," as used in reclamation petition, *held* not binding on court on question of time when petition was legally filed, as affecting rights of parties.

3. **Bankruptcy ⬅152—When petition in bankruptcy legally "filed" stated; "filing."**

Involuntary petition in bankruptcy presented to judge of District Court at 10:30 p. m. on particular day and filed in office of clerk of District Court at 9:30 a. m. following day, *held* not "filed" when presented to judge, or until lodged in clerk's office, within meaning of Bankruptcy Act, § 70a (Comp. St. § 9654), relating to vesting of trustee's title to property which, prior to filing of petition, bankrupt could have transferred; "filing" signifying delivery into actual custody of proper officer, and carrying idea of permanent preservation of thing as a public record.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, File.]

4. **Records ⬅7—Paper not "filed" until deposited with clerk of court.**

A paper in a case is not filed by presenting it to the judge, but is filed only when deposited with the clerk of the court, for the purpose of making it a part of the records of the case.

5. **Bankruptcy ⬅140(3)—Receiver in bankruptcy of partnership banking house held entitled to proceeds of check.**

Where check was received by partnership banking house on second day preceding filing of involuntary petition in bankruptcy, immediately credited to depositor's account, indorsed to another bank, which collected it the following day and credited bankrupts with the amount, *held*, relation of debtor and creditor between bank and depositor was established before filing of petition, and receiver in bankruptcy was entitled to proceeds of check.

6. **Time ⬅11—Account will not be taken of fractions of day, to defeat bankrupt's title to property.**

Law will take no account of fractions of a day, to defeat bankrupt's title to property, under Bankruptcy Act, § 70a (Comp. St. § 9654).

7. **Time ⬅11—Exceptions to fiction that day is an indivisible period of time stated.**

The legal fiction that a day is an indivisible period of time has numerous exceptions; one being that courts will disregard it where nec-